UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 24-CR-51 (RC) |
| v. : | |
| : | |
| BENJAMIN HEFFELFINGER, : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Benjamin Heffelfinger has pleaded guilty to two second degree misdemeanors, a violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly and disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count Three) and a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, and picketing in any Capitol building) (Count Four). For the reasons set forth herein, the government requests that this Court sentence Heffelfinger to 30 days of incarceration to be followed by 36 months of supervised release. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

**I.   Introduction**

Heffelfinger, currently 24 years old, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020

1

Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Heffelfinger pleaded guilty to violations of 40 U.S.C. § 5104(e)(2)(D) (disorderly and disruptive conduct in a Capitol Building or Grounds) (Count Three) and 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, and picketing in a Capitol building). The government's recommendation is supported by the fact that Heffelfinger (1) scaled a wall to reach the Upper West Terrace; (2) joined a riotous mob in chanting; (3) entered the Capitol building and, while inside, entered a private Congressional office; (4) also entered the Crypt, where he recorded the rioters' chaos on his phone; (5) stayed on Capitol grounds for another two hours after exiting the Capitol building; (6) falsely insisted that police officers allowed him into the building; and (7) has a recent criminal history, including multiple post-January 6, 2021 convictions.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Heffelfinger's crimes support a sentence of 30 days of incarceration to be followed by 36 months of supervised release, as well as 60 hours of community service. The aggravating factors above,

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

along with Heffelfinger's recent criminal history, explain why a sentence of incarceration is warranted in this case.

II.     **Factual and Procedural Background**

*The January 6, 2021, Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Statement of Offense, ECF No. 19 at ¶¶1-7.

*Heffelfinger's Role in the January 6, 2021, Attack on the Capitol*

Heffelfinger and his father flew from Columbus, Ohio, to Washington, D.C., in the early morning of January 6, 2021. Once in Washington, D.C., they attended the "Stop the Steal" rally at the Ellipse, where they listened to President Trump's speech. From the rally, Heffelfinger and his father walked down Constitution Avenue to the Capitol, entering Capitol grounds from the west.



*Image 1: Heffelfinger on restricted Capitol grounds.*

Once on restricted Capitol grounds, Heffelfinger left his father and scaled the wall of the Upper West Terrace Stairs to reach the Upper West Terrace. *See* Image 2.



*Image 2: Heffelfinger scaling a wall on restricted Capitol grounds.*

While on the Upper West Terrace, Heffelfinger joined other rioters in a chant of "USA! USA!", as captured in Image 3.



*Image 3: Heffelfinger on the Upper West Terrace chanting "USA! USA!"*

Despite knowing that the inside of the Capitol building was restricted and that he was not authorized to enter, Heffelfinger entered the Capitol building with other rioters through the Senate Wing Door at 3:12 p.m., as seen in Image 4.

4



*Image 4: Heffelfinger entering the Capitol building at 3:12 p.m.*

Closed-circuit television ("CCTV") footage from when Heffelfinger entered the building shows that other rioters were climbing into the building through broken windows near the Senate Wing Door as he was entering. *See* Image 4. A video taken by another rioter makes clear that at the time Heffelfinger entered the building, there were also other clear signs that he was not authorized to be inside. An alarm was blaring, and a rioter within Heffelfinger's earshot said, "Find the tunnels!" Another rioter who was immediately behind Heffelfinger stated, "The cops themselves have already gone down from tear gas." *See* Sentencing Exhibit 1, timestamp 00:06 to 00:15.

From the Senate Wing Door, Heffelfinger traveled with other rioters to the Crypt, where he recorded the scene on his phone, as captured in Image 5. The FBI's search of the defendant's cellphone did not result in the recovery of this recording, or any recording related to January 6.



*Image 5: Heffelfinger inside the Crypt at 3:14 p.m.*

From the Crypt, Heffelfinger went back down the same hallway through which he had entered. When he entered the vestibule next to the Senate Wing Door, it was filled with police officers who had strengthened their numbers and started successfully ushering out rioters. Heffelfinger exited the Capitol building with other rioters being ushered out by police at 3:17 p.m. through the Senate Wing Door. *See* Image 6.



*Image 6: Heffelfinger exiting the Capitol building at 3:17 p.m.*

Heffelfinger was inside the building for approximately five minutes. Heffelfinger and his father later flew back to Columbus, Ohio, on the evening of January 6.

*Defendant's Pre-Arrest Interview on July 6, 2021*

The FBI interviewed Heffelfinger on July 6, 2021, with his attorney present. Heffelfinger stated the following: Heffelfinger and his father attended the "Stop the Steal" rally at the Ellipse and watched President Trump's speech. After the speech, Heffelfinger walked with the crowd to the Capitol, and that as he walked, he "witnessed someone who had been pepper-sprayed by the police."

Heffelfinger falsely claimed that, once he was on Capitol grounds, he saw a line of police officers who were letting people in the building.[2] When he entered the building, there were police

---

[2] This was, of course, false: there was no line of police officers guiding people through the broken-open Senate Wing Door, and once Heffelfinger was inside, it would have been obvious that rioters outnumbered police officers in the Senate Wing.

7

officers blocking the hallway to his left, so he proceeded down the hallway to his right. He briefly entered an office, where other people were standing around and smoking. When he left that office, he walked down the hallway for a few more minutes, and then exited the building. He estimated that he was inside the building for five to ten minutes.

*Defendant's Pre-Sentencing Interview on June 3, 2024*

As a condition of his plea agreement, Heffelfinger agreed to be interviewed by the FBI before sentencing. ECF No. 18 at ¶ 2. Accordingly, the FBI interviewed Heffelfinger on June 3, 2024, with his attorney present. Heffelfinger stated that he traveled to Washington, D.C., on January 6, to accompany his father to President Trump's speech. After they heard the speech, the crowd started walking toward the Capitol to protest the election results. Heffelfinger stated that although he is "not a big political person," he "kind of" thought that President Trump had won the election.

When Heffelfinger and his father approached Capitol grounds, he saw people climbing up the wall, and he "thought it looked cool," so he climbed up the wall as his father used the stairs. They reconvened on the Upper West Terrace. There, Heffelfinger saw a door through which people were going in and out. He decided to go inside. His father did not enter, and he told Heffelfinger that he did not believe going inside was a good idea, and "I wouldn't go in there."

Nevertheless, Heffelfinger entered the Capitol building and was inside for approximately five minutes. Heffelfinger falsely claimed that there was a police officer standing immediately outside the Senate Wing Door, whom Heffelfinger asked if he could go inside, and the police officer responded by telling him not to touch anything and to respect the building. While he was inside, he looked inside an office, where he saw people smoking. He thought that people should not be doing that, so he shut the door and walked out of the building.

Once back outside, he rejoined his father. They remained on Capitol grounds for approximately a couple of hours. Over the course of that time, he saw people protesting, including people who had pepper spray on them. He also saw police officers in riot shields.

Heffelfinger was recording on a GoPro while he was inside the Capitol because he thought it would be a cool thing to have on video. However, Heffelfinger claimed that the GoPro did not have sufficient battery, so he did not actually record any footage.

When asked for his thoughts about his involvement in January 6, he stated that it was stupid to climb the wall, and that he wished he had not gone to D.C. at all, because it was not really his "thing" to take part in.

*The Charges and Plea Agreement*

On January 29, 2024, the United States charged Heffelfinger by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). ECF No. 14. On March 15, 2024, pursuant to a plea agreement, Heffelfinger pleaded guilty to Counts Three and Four of the Information, charging him with violations of 40 U.S.C. §§ 5104(e)(2)(D) and (G). ECF No. 18. By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol. *Id.* at ¶ 11.

### III. Statutory Penalties

Heffelfinger now faces a sentencing for violating 40 U.S.C. §§ 5104(e)(2)(D) and (G). As noted by the plea agreement and the U.S. Probation Office, for each charge, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As these offenses are Class B Misdemeanors, the Sentencing Guidelines do not apply to them. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.  Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 30 days of incarceration to be followed by 36 months of supervised release, as well as 60 hours of community service.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Heffelfinger's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Heffelfinger, the absence of violent or destructive acts is not a mitigating factor. Had Heffelfinger engaged in such conduct, he would have faced additional criminal charges.

Heffelfinger scaled a wall to reach the Upper West Terrace, and he told the FBI that he did so because he saw other people doing it, and he "thought it looked cool." The act of scaling a wall is a clear indication that Heffelfinger knew from the very beginning that he was somewhere he was not authorized to be. Despite this, Heffelfinger minimized his conduct by claiming that a police officer allowed him into the Capitol building, when there is no evidence to support this claim.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. Heffelfinger's History and Characteristics

According to the Presentence Investigation Report ("PSR"), Heffelfinger has the following prior criminal convictions:

- On February 2, 2021, Heffelfinger pled guilty to a November 2020 Illegal Use or Possession of Marihuana Drug Paraphernalia. He was sentenced to a $100 fine.

- On January 5, 2022, Heffelfinger pled guilty to Illegal Use or Possession of Drug Paraphernalia. He was sentenced to a $50 fine.

- On August 10, 2023, Heffelfinger pled guilty to Physical Control of a Vehicle While Under the Influence. He was sentenced to conditional probation for 1 year, participation in the Drivers Improvement Program in lieu of jail time, and 90 days on SCRAM, an alcohol monitoring device.

*See* ECF No. 25 (PSR) ¶¶ 32-34.

Heffelfinger has documented substance abuse history. Most notably, Heffelfinger had an opiate overdose on February 7, 2024, during which his mother administered Narcan to him and performed chest compressions. *Id.* at ¶¶ 60-62.[3] He subsequently entered and completed a detox and inpatient treatment, and as of his PSR interview, April 8, 2024, he was participating in an Intensive Outpatient Program. *Id.* at ¶¶ 12, 61. Probation reported that, both before and after his February 7, 2024 overdose, Heffelfinger has admitted to and/or tested positive for drugs, including on January 28, 2024 (sweat patches yielded a positive result for fentanyl); February 5, 2024 (urine sample tested positive for marijuana and fentanyl); May 11 and 27, 2024 (defendant reported that he used marijuana on those days); May 28, 2024 (urine sample tested positive for marijuana); June 24, 2024 (defendant admitted to using a "hard drug" on that date); and July 1, 2024 (defendant admitted to using marijuana the week prior to July 1, 2024). *Id.* at ¶ 12.

---

[3] Heffelfinger reported that he had also overdosed one additional time, approximately one year before the February 7, 2024, overdose. *Id.* at ¶¶12, 61.

11

Although the Sentencing Guidelines do not apply in this case, they are nevertheless instructive when determining how, if at all, Heffelfinger's substance abuse history should affect the sentence that the Court imposes. The Sentencing Commission's policy statement in U.S.S.G. §5H1.4, where it addresses the defendant's physical condition, including drug or alcohol dependence or abuse, states that drug or alcohol dependence or abuse ordinarily is not a reason for a downward departure. Where the Sentencing Commission has discouraged a particular factor as grounds for a departure, the Court may depart under the Guidelines only if the factor is present in the case to an exceptional degree "or in some other way makes the case different from the ordinary case where the factor is present." *Koon v. United States,* 518 U.S. 81, 95-96 (1996).

To warrant a downward departure under §5H1.4, the defendant must show that he has an "extraordinary physical impairment." The D.C. Circuit found in *U.S. v. Goodwin* that a defendant still experiencing pain from severe burns he sustained years prior, when the defendant had otherwise been able to live an "ordinary, functional existence," including earning a degree and keeping a job, did not rise to the level of an extraordinary physical impairment. *U.S. v. Goodwin*, 607 F.Supp.2d 47, 52-53 (D.C. Cir. 2009). Heffelfinger is currently in an outpatient treatment program (PSR at ¶ 61), and as of May 3, 2024, his mother reported to the Probation Office that Heffelfinger had gained employment (*id.* at ¶ 70). He is clearly living an ordinary, functional existence.

Additionally, the Bureau of Prisons provides substance abuse education and treatment programs. Heffelfinger's recent history of drug use supports Probation's recommendation that the defendant engage in Drug Abuse Education if incarcerated. *See id.* at ¶¶ 95-96. In sum, Heffelfinger's history of drug abuse is not a reason for the Court to sentence him to a more lenient sentence than it would another defendant who engaged in similar conduct.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

While the Government acknowledges that Heffelfinger accepted responsibility by entering into the plea agreement, a period of incarceration is nevertheless warranted because Heffelfinger did more than walk into and out of the restricted Capitol building after a short period time: Heffelfinger scaled a wall on restricted Capitol grounds; while on the Upper West Terrace, he joined the riotous mob in chanting; he then entered the Capitol building and, while inside, entered a private Congressional office; he also entered the Crypt, where he recorded the rioters' chaos on his phone; after exiting the Capitol building (with other rioters ushered out by police reinforcements near the Senate Wing Door), Heffelfinger stayed on Capitol grounds for another two hours, despite seeing police in riot gear and evidence that other rioters had been pepper sprayed; and after January 6, Heffelfinger lied to interviewing agents – twice – about officers letting rioters into the Capitol building. This shows a deliberate, intentional, and persistent bad conduct, even though Heffelfinger knew better.  Additionally, Heffelfinger's recent criminal history – including a conviction for illegal conduct that occurred right before January 6 (in November 2020) and two convictions for illegal conduct after January 6 – confirm that the light sentences he has received until now have not deterred his illegal conduct.  Therefore, the need for the sentence to provide specific deterrence to this particular defendant weighs in favor of a term of incarceration.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases.

Court must sentence Heffelfinger based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Heffelfinger has pleaded guilty to violations of 40 U.S.C. § 5104(e)(2)(D) (disorderly and disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count Three) and a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, and picketing in any Capitol building). These offenses are Class B misdemeanors. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Jeffrey Schaefer*, 22-cr-69, the defendant climbed a short wall to gain access to the Capitol. Judge Hogan sentenced him to 30 days of incarceration. In *United States v. Jacob Garcia*, 22-cr-118, the defendant scaled the walls outside of the Capitol using repurposed metal fencing, encouraged the mob to push past police officers, and was inside the building for

---

To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

nearly one hour. Judge Friedrich sentenced him to 30 days of intermittent confinement and 24 months of probation. In *United States v. Joshua Dressel*, 21-cr-572, the defendant climbed an approximate ten-foot high banister of the northwest stairs that led to the Upper West Terrace and the Capitol building. Judge Cooper sentenced him to 14 days of incarceration. In *United States v. Daniel Christmann*, 21-cr-502, the defendant entered the Capitol building around the same location and time as Heffelfinger, was inside for a few minutes, and lied about the circumstances of his entering the building. Judge Kollar-Kotelly sentenced him to 25 days of incarceration.

The Government acknowledges this Court's sentences in *United States v. Chapman*, 21-cr-00676, and *United States v. Travis Bartow*, 22-cr-00358, and *United States v. Katelyn Bartow*, 22-cr-00358, cases were the defendant scaled a wall on Capitol grounds. In each case, the Government recommended a term of incarceration, and the Court sentenced the defendant to a term of home detention and probation. However, Heffelfinger is distinguishable from these defendants, in that Chapman's criminal history was older, and not during the pendency of his case, and Travis Bartow and Katelyn Bartow had no criminal history.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

16

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V. Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Heffelfinger must pay $500 in restitution, which reflects in part the role Heffelfinger played in the riot on January 6.[6] ECF No. 18 at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Heffelfinger's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR at ¶ 102.

### VI.     Fine

The defendant's convictions for violations of 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G) subject him to a statutory maximum fine of $5,000 for each conviction. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1). Here, Heffelfinger's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine. *See* PSR at ¶ 82.

## VII. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Heffelfinger to 30 days of incarceration to be followed by 36 months of supervised release, as well as 60 hours of community service. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Heffelfinger's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

          Respectfully submitted,

          MATTHEW M. GRAVES
          United States Attorney
          D.C. Bar No. 481052

By:   */s/ Carolina Nevin*
       CAROLINA NEVIN
       Assistant United States Attorney
       601 D Street NW
       Washington, D.C. 20530
       NY Bar No. 5226121
       (202) 803-1612
       carolina.nevin@usdoj.gov